## RICE *et al. v.* EGE *et al.*

(*Circuit Court, N. D. New York.* June 30, 1890.)

1. PRINCIPAL AND AGENT—LIABILITY OF PRINCIPAL.

Upon making division of several oil leases in which plaintiffs and defendants were jointly interested, plaintiffs took a lease for land which had not been tested for oil, and received a written agreement, signed by one defendant in behalf of all the defendants, to pay plaintiffs $1,000 in case the oil-wells on the land transferred to plaintiffs should be unproductive. The defendants who did not sign this agreement knew of the exchange, and acquiesced in it. Their answer did not deny the execution of the agreement, and there was evidence to show that they authorized their co-defendant to sign the agreement, and afterwards ratified his act. *Held,* that they were bound by the agreement.

2. CONTRACT—EVIDENCE—OIL-WELL.

Said agreement having defined an unproductive well as one in which oil is not produced in paying quantities, evidence that the wells were drilled through the stratum in which oil was found, if at all, in that county, at an expense of about $3,000, and only a trace of oil discovered, is sufficient to show that the wells were unproductive.

At Law. Tried by the court, a jury having been waived.

*Hamilton Ward*, for plaintiffs.

*Charles H. Brown* and *John E. Brandegee*, for defendant Treat.

*George L. Roberts*, for other defendants.

COXE, J. Many of the facts appear in the opinion rendered upon the motion to amend the answer, *ante*, 658. These need not again be stated. Upon the merits, but two questions are presented. *First*, did the defendants enter into the agreement set out in the complaint? *Second*, were the wells on the Nelson and Dodson farms drilled to a sufficient depth to determine that they were unproductive?

Upon the first of these questions the issue, as before determined, is a narrow one. The answer admits that the defendants were interested with the plaintiffs in a large number of oil leases in Allegany county; that on July 1, 1881, a settlement was had, and a division of the leases was made between the plaintiffs and the defendants, and, recognizing the binding force of the agreement upon both parties, and relying upon its provisions for their exculpation, the defendants allege that pursuant to its provisions they were entitled to notice, and an opportunity to examine the Nelson and Dodson wells, in order that they might satisfy themselves of their unproductiveness. It is true that the answer avers "that said agreement was signed by J. A. Ege, and that the defendants H. B. Huff and M. C. Treat never signed said agreement," but this allegation adds no new element to the discussion. The plaintiffs do not contend that Treat and Huff, with their own hands, affixed their signatures to the paper. In fact the agreement on its face shows that they did not. The contention of the plaintiffs is that Ege, as the representative of the other defendants and with authority from them, negotiated the agreement with Norton, who had like authority to act for the plaintiffs. This statement of the situation seems nowhere to be denied in the answer and is not now disputed by Ege or Huff. But were the question of Ege's authority an open one a similar conclusion must be reached. The contract of July 1st was an equitable one. In the division of the leases the most valuable, the Richardson lease, was assigned to the defendants. Every consideration of fairness required that the plaintiffs should receive property of equal value, or at least that the expense of testing it should not fall entirely upon them. For his interest alone in the Richardson lease the defendant Treat received $1,292.50. On the other hand the testimony fails to show that the leases assigned to the plaintiffs had any value at all. Besides, the plaintiffs were liable to lose, and they have since lost, the large sum expended in drilling the two wells in question. The contract being a fair one to all the defendants, Treat included, there is no room for the suspicion that its terms were concealed from him. Were the positive testimony of Treat's participation in all of these transactions eliminated from the case the presumption that he had knowledge of them is irresistible. The defendants lived together in the same town. Treat had dealt in oil for 20 years. He was no novice. His place of business was directly across the street from Ege's bank. Their relations

were intimate. The evidence shows many joint ventures. They were in consultation regarding their oil interests immediately subsequent to the transaction of July 1st, and thereafter they bought property jointly and gave their joint note in payment, taking the title, however, in Ege's name alone. On the 1st day of July, the same day that the agreement in question was made, the plaintiffs assigned to the defendants, Treat being named in the assignment, all their interest in the Richardson lease, except 10 acres taken from the west side of the property. This assignment was recorded July 25, 1881. On the 13th of July, 1881, Treat assigned all his interest in the Richardson lease, and other leases, to Huff and Ege for $1,292.50; but he testifies that at that time he had ascertained, from recent developments, that the Richardson lease was the only one of value. On the 20th of July, 1882, Huff and Ege assigned to John Coast & Sons and H. and W. W. Rice their interest in the Richardson lease covering 46½ acres of land. As the original lease was for 57 acres, this assignment, evidently, did not cover the 10 acres reserved by the assignment of July 1, 1881. On the trial Treat produced the original Richardson lease, the assignment by the plaintiffs to the defendants of July 1st, and his assignment to Ege and Huff. The fact that Ege delivered the assignment of the Richardson lease to Treat is persuasive evidence that the latter knew of the assignment. The evidence regarding the 10 acres is unsatisfactory and obscure. It is difficult to determine from the proof in whom the title to the 10 acres vested after the settlement of July 1st, and there is nothing authentic to show who first conveyed this property after that settlement. No written assignment or conveyance of the property has been introduced in evidence. The accounts of its disposition are not in harmony, the evidence leaving the matter very much in doubt. It is entirely clear, however, that the defendant Treat never obtained title to the 10 acres until after his assignment of July 13, 1881, to Huff and Ege. He swears that he obtained the assignment of the 10 acres between the 15th and 30th of July, 1881. No one pretends that it was prior to July 13th. It seems, therefore, impossible to account for his receipt of nearly $1,300, except upon the theory of the settlement of July 1st. He certainly knew that if this 46 acres was owned by eight persons instead of three, $1,300 was too large a sum for one of them to receive for his interest. And it can hardly be insisted that this sum covered the other leases, for he swears that before that time the parties had ascertained that there was no value to any of the leases except the Richardson lease. The impression derived from all these facts is that Treat could not have been ignorant of the transactions carried on for his benefit and in his name. He must have known of them, and, had they been unauthorized there would have been some evidence of renunciation or dissatisfaction on his part. But in addition to these cogent inferences the record contains positive testimony that Ege's authority from Treat was ample, besides evidence from Ege, and others, that Treat not only had knowledge of Ege's acts but subsequently ratified and confirmed them. Treat denies this, but in many important instances his denial consists merely in a failure to recollect. The de-

fendants must, therefore, be held to the contract for the following reasons: *First*, the answer practically admits that they executed it. *Second*, the presumption is strong that Treat must have known of its existence and assented to its terms. *Third*, the preponderance of testimony establishes Ege's authority to make the contract. *Fourth*, Treat subsequently ratified and confirmed it.

Upon the remaining question the proof, establishing the unproductiveness of the wells, is clear. The character and extent of the test required must be measured by the contract and not by the opinion of witnesses. The contract provides for the payment of $1,000 if the Dodson and Nelson wells "prove to be unproductive as oil-wells, or not paying wells, viz.: wells in which oil is produced in paying quantities." If the testimony establishes the proposition that the plaintiffs pushed their investigations sufficiently to show that neither the Nelson nor Dodson well was one in which oil could be produced in paying quantities they are entitled to recover. Their right cannot be defeated by proof that a trace of oil was discovered or even by proof that one of the wells might be made to produce a few barrels, for such production was not sufficient to make it a paying well. The Nelson well was put down 1,600 feet. The Dodson well 1,377 feet. Oil in Allegany county is found, if at all, in the third sand. Both of these wells were drilled through the third sand, and little, if any, oil was discovered. Subsequent developments still further demonstrated their unproductiveness. They are surrounded by a circle of dry holes. No oil has been found in their vicinity. The plaintiffs are criticised because the wells "were not shot, torpedoed or tubed," but it would seem that it is not necessary to do this unless the drilling shows some promise of oil. A torpedo may make oil flow more freely, but it will not produce oil from barren sand. There was no possible motive for the plaintiffs to omit anything required to make the wells a success. It was manifestly for their interest that the wells should pay. There is no direct proof as to the amount agreed to be paid for drilling the two wells, but if it were at the rate which the evidence shows was paid for similar wells in Allegany county the plaintiffs were obligated to pay nearly $3,000. The, comparatively, small sum which they were to receive from the defendants in case the wells proved unproductive was no inducement to them to stop the work until every reasonable test had been made. Every incentive was in this direction. If the wells proved successful it meant a fortune to the plaintiffs. If they failed, it meant a large loss even after the $1,000 had been paid by the defendants. I am satisfied that the plaintiffs did all that the agreement required, and that nothing which they could have done would have developed oil in paying quantities in either of the wells in question. It follows that the plaintiffs are entitled to the judgment demanded in the complaint, with interest and costs.